UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| AMY MULLEN and NEA TIVERTON, LOCAL 833, NEARI, NEA<br>    Plaintiffs,<br><br>v.<br><br>TIVERTON SCHOOL DISTRICT; TIVERTON SCHOOL COMMITTEE, by and through its members, DR. JEROME LARKIN, DIANE FARNWORTH, SALLY BLACK, DEBORAH PALLASCH, and ELAINE PAVAO, in their individual and official capacities; and PETER SANCHIONI, in his individual capacity and his official capacity as SUPERINTENDENT OF TIVERTON SCHOOL DISTRICT,<br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 20-179-JJM-LDA |

MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

This dispute arises from an adverse employment action taken by the Defendants Town of Tiverton, its School District, and its School Committee (collectively "Tiverton") against Plaintiff Amy Mullen, a Tiverton special education teacher and president of the teachers' union, Local 833 of the National Education Association Rhode Island ("the Union"). Ms. Mullen and the Union sue the Defendants asserting claims of First Amendment retaliation for freedom of speech (Count 1), First Amendment retaliation for freedom of association (Count 2), and

violations of Rhode Island's Open Meetings Act, R.I. Gen. Laws § 42-46-1 *et seq.* (Count 3). ECF No. 24 at 10-13.[1] The Defendants move to dismiss all three counts under Fed. R. Civ. P. 12(b)(6). ECF No. 27.

I.   BACKGROUND[2]

For over twenty-five years Ms. Mullen has been a special education teacher in Tiverton. She received consistently positive performance evaluations from peers and supervisors throughout her career. Ms. Mullen has also served as President of the NEA Tiverton for twenty years. The Union is the exclusive bargaining agent for Tiverton's teachers. Under the Certified School Teachers' Arbitration Act, R.I. Gen. Laws § 28–9.3, Tiverton must bargain with the Union over all terms and conditions of its teachers' employment.

In July 2018, Peter Sanchioni became the Superintendent for Tiverton. Conflicts between Ms. Mullen and Supt. Sanchioni ensued.

In early March 2020, because of the COVID-19 pandemic, school districts throughout Rhode Island began planning for possible school closures and remote learning. Ms. Mullen became aware that Supt. Sanchioni was developing a distance learning plan to enable students to receive instruction remotely, without face-to-face contact with teachers in the classroom. Ms. Mullen, in her role as Union President,

---

[1] Ms. Mullen did not bring labor law retaliation claims.

[2] These facts are taken from Ms. Mullen's First Amended Verified Complaint (ECF No. 24) and Ms. Mullen's Affidavit. ECF No. 28-1 at 1-4. Because this is a motion to dismiss, the Court accepts as true all plausible facts as told by the Plaintiffs in their Complaint.

attended a Professional Development Committee meeting.  Before the meeting, Ms. Mullen told Supt. Sanchioni she would be sending him an email requesting bargaining over any distance learning plan. Supt. Sanchioni responded that he would not negotiate with her. He told Ms. Mullen she could "go ahead and file a grievance." Ms. Mullen replied that she would file a grievance but that she found it unfortunate that Supt. Sanchioni would rather waste Tiverton's funds on legal fees than collaborate with the Union to ensure an effective distance learning plan.

Later that evening, Ms. Mullen sent Supt. Sanchioni an email reminding him that any distance learning plan needed to be negotiated with the Union. The email also asked that Supt. Sanchioni contact Ms. Mullen "as soon as possible to set up a meeting for this purpose." Days later, a Union member contacted Ms. Mullen and informed her that Supt. Sanchioni was holding a meeting that day to discuss his distance learning plan. The member asked that a Union representative attend. Ms. Mullen, in her role as Union President, arrived at the meeting early.  She advised Supt. Sanchioni that the Union should be part of the discussions about any distance–learning-plan. Supt. Sanchioni raised his voice, told Ms. Mullen she was not invited to the meeting, and told her he would "write her up" for insubordination if she did not leave.  Ms. Mullen advised Supt. Sanchioni that he could not "write her up" for insubordination because she was not acting as a teacher, but in her role as Union President. She also informed him that the Union should have input into any distance learning plan before Tiverton submitted it to the Rhode Island Department of

Education ("RIDE"). Supt. Sanchioni informed Ms. Mullen that he had given the plan to RIDE. Ms. Mullen left before the meeting.

Supt. Sanchioni emailed Ms. Mullen chastising her for trying to represent her members and placing her on paid administrative leave pending an investigation. He also directed Ms. Mullen to "cease and desist all communication with parents, students, school committee members and staff members of the Tiverton Public Schools." The email also stated that "[f]ailure to comply will be construed as insubordination, and result in further disciplinary action."

This was not the first time Supt. Sanchioni issued a gag order prohibiting Ms. Mullen from speaking with her Union members. The year before, Supt. Sanchioni placed Ms. Mullen on administrative leave in violation of the parties' collective-bargaining agreement and directed Ms. Mullen, as Union President, not to communicate with her members during the leave. Ms. Mullen was reinstated, but Supt. Sanchioni's gag order remained subject to an unfair labor practice complaint issued by the Rhode Island State Labor Relations Board in Case No. ULP 6240. 20.

Supt. Sanchioni advised Ms. Mullen by letter ("first letter") that he intended to recommend to the Tiverton School Committee that it suspend Ms. Mullen without pay until the end of the 2020-2021 school year, and that it terminate her at the end of that school year. According to the letter, "[t]he reason for these actions is [her] persistent disruption and insubordination, particularly as it relates to a plan for distance learning in response to the COVID-19 pandemic that closed the schools."

The letter said Ms. Mullen's prior statements at the two meetings was the basis for her discipline.

The Tiverton School Committee voted unanimously to fire Ms. Mullen from her teaching position. The Chairperson, Defendant Jerome Larkin, informed Ms. Mullen that the School Committee had terminated her employment because of the conduct outlined in Supt. Sanchioni's letter.

In response to the suspension and termination, Ms. Mullen filed this lawsuit alleging that her termination violated the First Amendment. Although the School Committee had terminated Mullen's employment for the reasons stated in his first letter,[3] Supt. Sanchioni sent a second letter to Ms. Mullen ("second letter") advising her that he would be asking the School Committee at its next meeting to suspend her "for a period up to and including the end of the 2020-2021 school year, and then terminate [her] at the end of that 2020-2021 school year." The letter also said Supt. Sanchioni would provide "additional bases" for his recommendation, including an email Ms. Mullen sent to educators in late March about distance learning and a communication that Ms. Mullen made about educational issues in a Facebook group. According to Supt. Sanchioni, Ms. Mullen's participation in a discussion of education in a Facebook group violated his previously issued gag order. At the School Committee meeting, Supt. Sanchioni requested that the School Committee amend its previous vote to terminate Ms. Mullen (which had been effective immediately), and recommended that it suspend Ms. Mullen without pay, and then terminated at

---

[3] The letter was sent on April 23, 2020 but backdated to April 15, 2020.

the end of the 2020-2021 school year, for the reasons set forth in his second letter to Ms. Mullen.

With no discussion about the allegations made by Supt. Sanchioni, the School Committee voted to suspend and terminate Ms. Mullen in accordance with Supt. Sanchioni's latest recommendation.  The School Committee's attorney e-mailed a letter to Ms. Mullen's counsel.  The letter provides, "the Committee voted to suspend you without pay for a period up to and including the end of the 2020-2021 school and then terminate the employment relationship at the end of the 2020-2021 school year. The causes for said suspension and termination are set forth in [Supt. Sanchioni's second letter]." ECF No. 25-2.

Ms. Mullen filed a First Amended Complaint ("Complaint"), contesting her second termination and adding a count against all Defendants for violating the Rhode Island Open Meetings Act.[4]

---

[4] After the filing of the Amended Complaint, Supt. Sanchioni emailed Tiverton school staff requesting volunteers to serve on a School Reopening Committee.  Even though the School District still employed Ms. Mullen was still employed by the School District and was also Union President, Supt. Sanchioni did not email her.  According to Supt. Sanchioni's email, the role of the School Reopening Committee was to develop a comprehensive plan for reopening the Tiverton Public Schools in the fall.

Ms. Mullen asked to serve on the School Reopening Committee.  A week later, the School District's legal counsel emailed the Union's attorneys prohibiting Ms. Mullen from joining the School Reopening Committee because "the School Reopening Committee is a committee of School Department staff and parents of Tiverton students only.  Because Ms. Mullen is neither an active member of the School Department staff, nor a parent of a Tiverton student, she is not eligible for membership in the Reopening Committee."  The email further provides, "since Ms. Mullen is suspended, she is not permitted to be on School Department property" and "she is to refrain from speaking directly to building principals or assistant principals, consistent with any employee on suspension status."

## II.   STANDARD OF REVIEW

The Federal Rules of Civil Procedure require a complaint to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).  The complaint must have sufficient factual allegations that plausibly state a claim upon which relief can be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This standard requires more than a recitation of elements and must allow the Court to draw a reasonable inference that a defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009).  The Court must accept a plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Gargano v. Liberty Int'l Underwriters*, 572 F.3d 45, 48 (1st Cir. 2009).

## III.   DISCUSSION

### A. First Amendment Retaliation for Freedom Speech (Count I)

To decide whether a public employee is protected from retaliation for her speech, the Court should weigh three factors. *Decotiis v. Whittemore*, 635 F.3d 22, 29-30 (1st Cir. 2011).  "First, the Court must determine 'whether the employee spoke as a citizen addressing matters of public concern.'"  *Id.* at 29 (quoting *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007)).  Second, the Court should "balance... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [Town], as an employer, in promoting the efficiency of the public services it performs through its employees."  *Curran*, 509 F.3d at 44 (quoting *Pickering v. Bd of Educ.*, 391 U.S. 563, 568 (1968)).  And "third, the employee

must 'show that the protected expression was a substantial or motivating factor in the adverse employment decision.'" *Id.* at 45.

### 1.   *Spoke as a Citizen Addressing Matters of Public Concern*

A public employee speaking pursuant to their official duties is not speaking as a private citizen and such speech does not insulate their communication from an adverse employment action. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).   In *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011), the First Circuit listed the following non-exclusive factors as instructive when determining whether speech was made pursuant to official duties:

> [W]hether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech. (citations and quotations omitted)

Several of these factors favor Plaintiffs' claim that Ms. Mullen's speech was made as a private citizen.  For example, Tiverton did not pay Ms. Mullen to make the speech at issue, and no observer would have the impression that her speech represented her employer.   Defendants point to factors that show the opposite– including the fact that Ms. Mullen's speech was made up the chain of command and that there is no citizen analogue to her speech.   However, in her interactions with Supt. Sanchioni, Ms. Mullen was not speaking pursuant to her official duties as a schoolteacher or Tiverton employee.  In fact, from the reasons Tiverton provided for

Ms. Mullen's termination, it is clear Ms. Mullen was trying to engage with Supt. Sanchioni in her role as Union President.

Each time, Ms. Mullen was trying to engage Supt. Sanchioni in a conversation about how the pandemic would affect her Union members and to ensure the Union's voice was included in any potential distance learning plan. Her comments were not made as an individual teacher assessing the merits of any specific plan, but as a Union President asking that the Union take part in the process.

Defendants effectively argue that, by speaking in her role as Union President, Ms. Mullen's could not have been speaking as a private citizen. The Court is unpersuaded by this argument. While Union membership is necessarily tied to one's employment, the adversarial nature of labor negotiations suggests many contexts in which a union official's speech could not possibly have been made as part of their official employment duties. Many courts have arrived at a similar conclusion. *See, e.g., Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) ("It is axiomatic that an employee's job responsibilities do not include acting in the capacity of a union member, leader, or official."); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1060 (9th Cir. 2013) ("Given the inherent institutional conflict of interest between an employer and its employees' union, we conclude that a police office does not act in furtherance of his public duties when speaking as a representative of the police union."). Plaintiffs sufficiently plead facts suggesting that Ms. Mullen's spoke in her role as a private citizen and not in her capacity as a schoolteacher for Tiverton.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v Myers*, 461 U.S. 138, 147-48 (1983). While the fact that speech is "related to union activity is not sufficient by itself to dispense with full-dress *Connick* analysis . . . that fact does point in the direction of finding that the speech involved a matter of public concern." *Davignon v. Hodgson*, 524 F.3d 91, 101 (1st Cir. 2008).

The statements made by Ms. Mullen toward Supt. Sanchioni all centered on the Union's involvement in the development of a distance learning plan. As Tiverton's response to the COVID-19 pandemic, any plan, and how it was developed, would be of great public concern. As school districts throughout the nation can attest, the pandemic and subsequent moves to distance learning have often greatly affected the ability of individual teachers to carry out their duties. Any shift from in-person learning to an abrupt plan for remote learning—as well as discussions of the role that teachers should be playing in developing such a plan—is of paramount importance to the broader public.

### 2. *Balance... the Interests*

Having found that Ms. Mullen has pleaded sufficient facts to show she was speaking as a private citizen on a matter of public concern, next there must be a balancing of the interests of Ms. Mullen and the interests of Tiverton. When acting in the role of employer, Tiverton has broader discretion to restrict speech on its employees but such restrictions "must be directed at speech that has some potential

effect to the entity's operation." *Garcetti* 547 U.S. at 418. "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.*, at 419. "In assessing the government's interest in allaying disruption and inefficiencies in the workplace, a court should include in its considerations (1) 'the time, place, and manner of the employee's speech,' and (2) 'the employer's motivation in making the adverse employment decision.'" *Decotiis v. Whittemore*, 635 F.3d 22, 35 (1st Cir. 2011) (quoting *Davignon v. Hodgson*, 524 F.3d 91, 104 (1st Cir. 2008)). Adverse employment actions for a public employee's "protected speech offends the constitution [because] it threatens to inhibit exercise of the protected right, and...the First Amendment prohibits government officials from subjecting an individual to retaliatory actions... for speaking out." *Mercado-Berrios v. Cancel-Algeria*, 611 F.3d 18, 25 (1st Cir. 2010) (quoting *Hartman v. Moore*, 547 U.S. 250, 256, (2006)).

Tiverton argues that Ms. Mullen was terminated due to insubordination that stemmed from her attempts to engage in discussions about Tiverton's pandemic response. However, the development of a distance learning plan is of great public concern, and Ms. Mullen was trying to involve the Union in such planning. Tiverton's interest in Ms. Mullen's subordination and silence as an employee does not outweigh the importance of allowing a more than twenty-year veteran teacher and Union President trying to ensure that teachers are adequately represented in discussions about how their fundamental jobs would change due to distance learning. Interpreted

in the light most favorable to Plaintiffs, restricting Ms. Mullen's speech was hardly necessary to protect Tiverton's efficient and effective operations.   Rather, Ms. Mullen's statements offered potentially relevant information aimed at ensuring that any distance learning plan be as effective as possible.   Her statements were made in appropriate and relevant contexts–before professional meetings, and over email–in a minimally disruptive fashion.   The interests of Ms. Mullen engaging in this sort of activity outweighs Tiverton's interest as an employer and their ability to restrict Ms. Mullen's speech.

### 3. Protected Expression was a Substantial or Motivating Factor

Finally, Ms. Mullen must show her protected speech was a "substantial or motivating factor in the adverse employment decision." *Curran* at 45.  The Court finds Plaintiffs have alleged sufficient facts to show Ms. Mullen's termination resulted from her protected speech.  In the revised letter Supt. Sanchioni sent to Ms. Mullen letting her know of his recommendation for her suspension and termination, five reasons were provided.  ECF No. 28-1 at 6.  Two of the five reasons were specifically for Ms. Mullen's attempt to engage Tiverton in union bargaining and discussion on the matter of distance learning; these include the interaction between Supt. Sanchioni and Ms. Mullen at the two meetings.

Another reason for Ms. Mullen's termination was that Mr. Sanchioni had directed Ms. Mullen "to refrain from contact with Tiverton staff and the school community." ECF No. 28-1 at 7.  However, Ms. Mullen "directed... communications to a Facebook group numbering in the thousands..." which contributed to the reasons

for her termination. ECF No. 28-1 at 7. The Facebook post made by Ms. Mullen was from her personal Facebook account to a public "Tiverton Happenings" public page. Ms. Mullen's post, in its entirety reads: "You would be correct in your beliefs." ECF No. 28-1 at 12. Nothing in the record indicates Ms. Mullen stated she was a public school teacher or that she was responding on behalf of the school district, nor is there any indication that this post went out to anyone in the school community. The Facebook post was made by a private citizen on a public forum available to anyone interested in keeping up to date on what is happening in Tiverton.

The Plaintiffs plead sufficient facts to show Ms. Mullen's protected speech was a substantial factor in her termination.

### B. First Amendment Retaliation for Association (Count 2)

"The public employee surely can associate and speak freely and petition openly, and [she] is protected by the First Amendment from retaliation for doing so." *Smith v. Arkansas State Highway Empl., Local 1315*, 441 U.S. 463, 465 (1979). "[T]he Supreme Court [has] noted that a public employee possesses a First Amendment right to associate with a union." *Palardy v. Township of Millburn*, 906 F.3d 76, 84 (3d Cir. 2018). To prevail on a retaliation claim, Plaintiffs must show "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights and . . . a link between the constitutionally protected conduct and the retaliatory action." *Id.* (quoting *Thomas v Independence Township,* 463 F.3d 285, 296 (3d Cir. 2006)). "[I]n instances where a government employee claims her employer has taken adverse action that is violative of associational rights[,]"

Plaintiffs must also show that the protected expression was a substantial or motivating factor in the employment decision. *Davignon v. Hodgson*, 524 F.3d 91, 108 (1st Cir. 2008).

As described above, Plaintiffs' Complaint has many facts connecting Ms. Mullen's termination to her association with the Union. Again, two of the five reasons provided by the Defendants for Ms. Mullen's termination pointed to meetings where she tried to engage Supt. Sanchioni on collective bargaining with the Union. ECF No. 28-1 at 7. At several times, Ms. Mullen expressly identified as speaking on behalf of the Union and was rebuffed. Directly before the first meeting cited in reasons for her termination, when informing Ms. Mullen that he would not negotiate with her, Supt. Sanchioni told her that she could "go ahead and file a grievance." ECF No. 24 at 5. Ms. Mullen then attended the second meeting only after it was brought to her attention by a Union member. At this meeting, Supt. Sanchioni again refused negotiations and ordered Ms. Mullen to leave. ECF No. 24 at 6. Shortly afterwards, Supt. Sanchioni placed Ms. Mullen on administrative leave, and directed Ms. Mullen to cease and desist all communications with the school community. A few weeks later, she was terminated from her position. ECF No. 24 at 6-7.

Ms. Mullen's cease and desist and subsequent termination undermined her capacity to serve her Union membership. Both barred her from speaking to Union members and taking part in school meetings discussing topics relevant to the Union and its members. She received these sanctions while asserting the Union's interests, while representing herself as Union President. Contrary to the Defendants'

argument that her association claim is duplicative of her speech claim, Ms. Mullen's significant involvement with her Union and the circumstances of her termination create a plausible association claim.   The Court finds that Plaintiffs have pled sufficient facts to show that because of Ms. Mullen's association with the Union, she was retaliated against by Tiverton when trying to exercise her freedom of association rights.[5]

## C.  Opening Meetings Act Violation (Count 3)

Plaintiffs claim Tiverton violated the Rhode Island Open Meetings Act ("Act") by not providing sufficient notice for the May 5, 2020 School Committee meeting in which Ms. Mullen's employment was discussed and ultimately terminated.   The Act supplies specific rules surrounding the notice requirement the School Committee must follow and it reads in pertinent part:

---

[5] The First Circuit has declined to address the disagreement between Courts of Appeals on whether *Connick's* public concern requirement for freedom of speech claims also applies to freedom of association claims. *Davignon v. Hodgson*, 524 F.3d 91, 108 n. 9 (1st Cir. 2008) ("We have explicitly reserved this question, which has divided the Courts of Appeals.") (citing *Tang v. State or R.I.*, 163 F.3d 7, 11 n. 4 (1st Cir. 1998).   Either answer supports Plaintiffs.   Were this Court to apply the public concern requirement to Plaintiffs' association claim, the claim would pass muster for the same reasons the speech claim did. *See, e.g., Marshall v. Allen*, 984 F.2d 787, 798 (7th Cir. 1993) ("Thus, in applying *Connick* and its public concern requirement to freedom of association claims raised by public employees, this court found no reason to differentiate among the various rights protected under the First Amendment.   Therefore, [Plaintiff's] associational activities...did relate to matters of public concern as delineated in the freedom of speech section of this opinion.").   Were this Court to decline to apply the public concern requirement, Plaintiffs claim would similarly survive. *See, e.g., Palardy v. Twp. of Millburn*, 906 F.3d 76, 83 (3rd Cir. 2018), *cert. denied sub nom. Twp. of Millburn N.J. v. Palardy*, 139 S. Ct. 2011 (2019) ("By holding that mere membership in a public union is always a matter of public concern, the Fifth Circuit's approach avoids this problem. *Connick's* public-concern requirement thus stands as no obstacle to [Plaintiff's] associational claim.").

> Public bodies shall give supplemental written public notice of any meeting within a minimum of forty-eight (48) hours, excluding weekends and state holidays in the count of hours, before the date. This notice shall include the date the notice was posted; the date, time, and place of the meeting; and a statement specifying the nature of the business to be discussed.

R.I. Gen. Laws § 42-46-6(b).

When applying the language of the Act, courts have held that their "task is to determine whether the notice provided by the * * * council fairly informed the public, under the totality of the circumstances, of the nature of the business to be conducted[.]" *Pontarelli v. Rhode Island Bd. Council on Elementary & Secondary Educ.*, 151 A.3d 301, 306 (R.I. 2016) (quotations omitted).

Additionally, the Act details the way job performance of an employee may be discussed in closed session. A public body may hold a closed meeting for these purposes:

> (1) Any discussions of the job performance, character, or physical or mental health of a person or persons provided that such person or persons affected shall have been notified in advance in writing and advised that they may require that the discussion be held at an open meeting. Failure to provide such notification shall render any action taken against the person or persons affected null and void. Before going into a closed meeting pursuant to this subsection, the public body shall state for the record that any persons to be discussed have been so notified and this statement shall be noted in the minutes of the meeting.

> (2) Sessions pertaining to collective bargaining or litigation, or work sessions pertaining to collective bargaining or litigation.

R.I. Gen. Laws § 42-46-5(a)(1-2).

Within the May 5 meeting minutes, agenda item seven provides for a "possible executive session," which is further detailed with the following: "Motion was made by Ms. D. Pallasch to move into executive session under RIGL 42-46-5(a)(2)

(litigation/legal advice)(personnel)(teacher termination)." ECF No. 27·1 at 2. Agenda item eight refers to the return to open session in which there is a note that no votes were taken. There are no other notes related to the executive session provided in the meeting minutes.

Any discussion of personnel and teacher termination during a closed session requires the Committee to follow the Act's procedures under § 42·46·5(a)(1). According to Plaintiffs' Complaint, Ms. Mullen explicitly asked that the School Committee's discussion of her job performance at the meeting take place in open session. ECF No. 24 at 8. While the agenda cites RIGL 42·46·5(a)(2), Plaintiffs allege that the School Committee discussed Ms. Mullen's job performance, character, or physical or mental health during the closed session, in violation of her request and the Act.

The Complaint also claims deficiencies in the notice provided to the public by the meeting agenda. Plaintiffs allege that there was substantial public confusion about whether there would be a discussion in open session about Ms. Mullen's termination. ECF No. 24 at 9. Observing the School Committee agenda, the only potential indication that Ms. Mullen's termination would be discussed were the parentheticals "personnel" and "teacher termination" appended to the "possible executive session" agenda item. More confusingly, that same item included the parenthetical "litigation/legal advice" and cited the Act's provision about litigation and collective bargaining, but not teacher termination. From the agenda, it is hardly clear that Ms. Mullen's termination would be discussed–let alone in open session.

Given the totality of the circumstances—a discussion on the termination of a long-standing teacher and Union President—it is plausible that such notice was insufficient for fairly informing the public. For these reasons, the Court finds the Plaintiffs have pled sufficient facts to support a violation of the Rhode Island OMA.

### D. Claims Against Individual School Committee Members

Tiverton argues that because the Plaintiffs do not plead specific plausible conduct by the School Committee members that would state a claim upon which relief could be granted, the Plaintiffs' Complaint fails to satisfy the pleading requirements of alleging "a plausible entitlement to relief." *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008). Tiverton also argues that the individual school committee members are entitled to qualified immunity.

"The qualified immunity doctrine provides defendant public officials an immunity from suit and not a mere defense to liability." *Decotiis*, 635 F.3d at 36, quoting *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir.2009). To overcome qualified immunity, a plaintiff must first "mak[e] out a violation of a constitutional right and, second, establish[] that the right was 'clearly established' at the time of the defendant's alleged violation." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)). "The 'clearly established' step comprises two subparts: first, whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right,' and second, 'whether in the specific context of the case, 'a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.''" *Id.* (quoting *Mosher v. Nelson*, 589 F.3d 488, 493 (1st Cir. 2009).

Plaintiffs make plausible claims of First Amendment violations by the School Committee when they terminated Ms. Mullen in retaliation for her protected speech. This Court has found that the Plaintiffs have plausibly alleged that Tiverton, through the actions of the School Committee, violated Ms. Mullen's constitutional rights. Moreover, "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." The right of a Union official to speak freely, even when she is also a public employee, without fear of losing her job has been clear enough for years. Moreover, "a reasonable defendant would have understood that his [or her] conduct violated the plaintiffs' constitutional rights. The School Committee members voted based on a letter from Supt. Sanchioni that in essence said she should be fired for trying to speak out about a matter of public concern, and for commenting publicly on a Facebook group page. Given this, the Court finds the School Committee members, in their individual capacities, are not immune from this suit based on the allegations.

### E.  Claims Against School Committee and School District

Fed.R.Civ.P. 17(b) provides that a party's "capacity to sue or be sued shall be determined by the law of the state in which the district court is held." Under Rhode Island law, "municipal agencies are not entities capable of being sued; they are merely administrative arms of a municipality that do not have a legal identity separate and apart from the municipality itself." *Town of Cumberland v. Vella-Wilkinson*, No. PC 10-2096, 2012 WL 3235385, at *15 (R.I. Super. Aug. 01, 2012). *See E. Providence Sch. Comm. v. Smith*, 896 A.2d 49, 53 (R.I. 2006) ("[T]his Court has, on several

occasions, clarified the legal status of school committees by noting that they are departments of their respective municipalities.").

The Tiverton School Committee and Tiverton School District are effectively administrative arms of the municipality of Tiverton.  As such, this suit is more properly brought against the Town of Tiverton directly.[6]  The Court finds that while the School Committee and School District are improperly named in this suit, it will consider the plausibility of Plaintiffs' claims against the appropriate defendant, the Town of Tiverton.[7]

### F. Claims Against Town

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government

---

[6] Fed.R.Civ.P. 21 states that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."  Given the early stage of this litigation, and the fact that both parties referenced the possibility of Tiverton as a defendant directly in their pleading, adding the Town as a defendant seems appropriate. Plaintiffs must still "comply with the requirements of Rules 3 and 4 of the Federal Rules of Civil Procedure relating to the issuance of a summons and service on the added party." *Hershey Foods Corp. v. Padilla*, 168 F.R.D. 7, 10 (D.P.R. 1996) (citing *Landers Seed Co. v. Champaign Nat. Bank*, 15 F.3d 729, 732 (7th Cir.) *cert. denied* 513 U.S. 811 (1994)).

[7] Defendants have noted that Plaintiffs failed to comply with R.I. Gen. Laws § 45-15-5.  However, any claims against the Town for declaratory or injunctive relief remain viable, as "in general, equitable actions do not fall within the purview of § 45-15-5." *Diorio v. Hines Rd., LLC*, 226 A. 3d 138, 149 n. 11 (R.I. 2020) (quoting *United Lending Corp. v. City of Providence*, 827 A.2d 626, 632 (R.I. 2003)).  Any monetary claims can be obtained against the individual defendants only. *See id* ([M]onetary claims . . . are strictly governed by § 45-15-5").

as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). A successful claim "requires two basic elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the City [was] responsible for that violation." *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 25-26 (1st Cir. 2005). For the latter element, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 (1986).

R.I. Gen. Laws § 16-2-9, outlining the general powers and duties of municipal school committees, begins:

> (a) Unless the responsibility is otherwise delegated by this chapter, the entire care, control, and management of all public school interests of the several cities and towns shall be vested in the school committees of the several cities and towns. School committees shall have, in addition to those enumerated in this title, the following powers and duties . . .

The statute then lists several powers and duties that are potentially relevant here, including "(3) [t]o provide for and ensure the implementation of federal and state laws..."; "(6) [t]o have overall policy responsibility for the employment and discipline of school department personnel"; "(14) [t]o establish minimum standards for personnel, to adopt personnel policies, and to approve a table of organization"; "(15) [t]o establish standards for the evaluation of personnel"; and "(23) [t]o delegate, consistent with law, any responsibilities to the superintendent as the committee may deem appropriate." R.I. Gen. Laws § 16-2-9(a).

As discussed above, Plaintiffs have sufficiently pled violations to Ms. Mullen's constitutional rights under the First Amendment. Moving on to the question of municipal liability, Plaintiffs connect the violations directly to the actions of Supt. Sanchioni and the School Committee. Based on the R.I. Gen. Laws cited above, both parties were delegated immense authority over the creation and management of school personnel policy. This Court finds that Plaintiffs have pleaded sufficient facts to show that the Town may be held liable as a municipality for the adverse actions taken by the School Committee and Supt. Sanchioni in this case.

IV.   CONCLUSION

The Court DENIES Defendants' Motion to Dismiss. ECF No. 27. The Town of Tiverton is substituted as Defendant replacing the Tiverton School District and the Tiverton School Committee.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

September 29, 2020